# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 15, 2009       Decided January 15, 2010

No. 07-3071

UNITED STATES OF AMERICA,
APPELLEE

v.

SIROCCO D. JOHNSON, ALSO KNOWN AS ROCCO,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 03cr00488-01)

*A. J. Kramer*, Federal Public Defender, argued the cause and filed the briefs for appellant.

*Sarah T. Chasson*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Jeffrey A. Taylor*, U.S. Attorney at the time the brief was filed, and *Roy W. McLeese III* and *Chrisellen R. Kolb*, Assistant U.S. Attorneys.

Before: HENDERSON and GARLAND, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* RANDOLPH.

RANDOLPH, *Senior Circuit Judge*: A jury convicted Sirocco Johnson of possessing heroin and crack cocaine with the intent of distributing both substances; and of using, carrying, or possessing a firearm in connection with a drug offense. Each of the charges stemmed from a search of a bedroom Johnson occupied in a townhouse where his mother, stepfather and sister lived. Johnson raises rather routine issues regarding the sufficiency of the evidence, a jury instruction and an evidentiary ruling. After discussing these issues we will deal with the serious question in the case – whether the government failed to disclose exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

I

At dawn on August 21, 2003, a dozen FBI agents executed a search warrant at 1138 Wahler Place, S.E., Washington, D.C. No one answered the agents' knock on the townhouse door so they broke it down, tossed in a "flash bang," and entered. At that moment, an agent stationed outside saw a white bundle fly out of a window on the townhouse's second floor. The entering agents saw no one on the first floor or in the basement. On the second floor, in one of the bedrooms, they discovered Johnson, then twenty-three years old, shirtless, crouching next to the window from which the bundle had been tossed. Johnson's twelve-year-old cousin was also in the room, lying on the floor next to the bed. Johnson's mother and stepfather were in the second floor master bedroom.

Johnson's bedroom was quite cluttered, with clothing and other items strewn about the floor. Among the clutter, the agents found a black Hugo Boss bag. Inside the bag was a

shoebox containing 520 grams of heroin. The bag also contained a rubber glove and procaine, a diluting or "cutting" agent. Near or in the bedroom closet, an agent found two transparent baggies filled with a total of 73 grams of crack cocaine. The agents also found mail, a temporary vehicle registration, and other documents bearing Johnson's name. The agent stationed outside recovered the bundle, which turned out to be a small bag of marijuana and a loaded nine-millimeter handgun wrapped in a white t-shirt.

The three-day jury trial took place in April 2005. The government's key witnesses were the FBI agents who participated in the raid. The government also called an officer who gave expert testimony that drug dealers commonly store their inventory in "stash houses" owned by trusted friends or relatives. Johnson's only witness was his mother, Caroline Williams, who admitted that the room containing the drugs served as a bedroom for Johnson. (Her husband, Carlos Williams, owned the townhouse.) She added that Johnson did not always sleep in that room. Sometimes he stayed the night at another house with the mother of his child. Mrs. Williams also testified that others used the bedroom. Two of her nephews and her brother-in-law played video games there, slept overnight, and left their clothes there. From a photograph of the bedroom, Mrs. Williams identified items of clothing belonging to these men. During cross-examination, Mrs. Williams admitted that she had been convicted of attempted possession of cocaine, attempted distribution of cocaine, and, on two separate occasions, felony larceny in Virginia.

In closing argument, Johnson's counsel stressed that everyone who lived in Johnson's home, as well as others, had access to his bedroom and may have placed the drugs there. The prosecutor offered two counter-theories – that the drugs were Johnson's or that he was stashing them for "another

organization." The jury convicted Johnson of the heroin, crack, and gun counts, but acquitted him of possession with intent to distribute marijuana.

While representing another client after Johnson's conviction, Johnson's attorney happened upon an FBI wiretap application indicating that the heroin seized from Johnson's bedroom actually belonged to a drug dealer named Cinquan Blakney, Johnson's cousin. The affidavit in support of the wiretap, prepared by Special Agent Daniel Sparks, stated that Sparks had been receiving information from confidential informants about a gang-related drug distribution enterprise. One of these informants told Sparks that he had discussed Johnson's arrest with Blakney. According to the informant, Blakney said that the heroin seized from Johnson's bedroom belonged to Blakney and that Blakney's mother had conveyed to Johnson's mother that Johnson "has to take his beef."

The affidavit containing these statements was dated February 2004 – six months after Johnson's arrest and a year before his trial. When Johnson's attorney brought this evidence to the government's attention, the government filed a letter indicating that the same informant told a D.C. Metropolitan Police Department detective that Blakney had stored a half kilogram of heroin at 1138 Wahler Place, and that the seizure there was a setback for Blakney.

Johnson moved for a new trial, arguing that the government's failure to disclose the information violated *Brady v. Maryland*, 373 U.S. 83 (1963); that the district court improperly instructed the jury; and that the court erred in refusing to admit a particular document. He also moved for a judgment of acquittal on the basis that the evidence was insufficient to support his convictions. The court denied the motions.

As discussed in Part III of this opinion, further information regarding Blakney surfaced in post-argument filings in this court.

II

Contrary to Johnson's argument, the government presented sufficient evidence for rational jurors to conclude beyond a reasonable doubt that Johnson constructively possessed the drugs and firearm. Johnson's location and the location of the drugs in his bedroom provided ample evidence for the jury to conclude that Johnson had the ability to exercise knowing "dominion and control" over the drugs. *United States v. Byfield*, 928 F.2d 1163, 1166 (D.C. Cir.1991). It is a fair inference that a defendant exercises constructive possession over contraband found in a room he personally occupies. *See United States v. Dykes*, 406 F.3d 717, 721–22 (D.C. Cir. 2005); *United States v. Morris*, 977 F.2d 617, 620 (D.C. Cir. 1992). Viewing the evidence in the light most favorable to the government, *see Dykes*, 406 F.3d at 721, we also believe a rational jury could find that Johnson possessed the gun. Someone wrapped the gun in a t-shirt and threw it out of the bedroom window as the agents entered the townhouse. That someone, the jury could conclude, was Johnson. He was crouching next to the same window and was shirtless when the agents arrived seconds later. The only other person in the immediate vicinity was a twelve-year boy, who was across the room. Johnson's possession of the gun was also evidence that he was guilty of the drug charges. We have recognized many times that "drugs and guns go together." *United States v. Jenkins*, 928 F.2d 1175, 1179 (D.C. Cir. 1991); *see United States v. McLendon*, 378 F.3d 1109, 1113 & n. 4 (D.C. Cir. 2004). A suspect's possession of a gun that is in close proximity to drugs is strong evidence of his possession of the drugs. *See, e.g., United States v. Moore*, 104 F.3d 377, 381 (D.C. Cir. 1997); *Jenkins*, 928 F.2d at 1180.

Johnson also complains about a portion of the district court's instructions on the gun charge. At one point the court told the jury that a "gun may be deemed to be used in relation to [a drug trafficking] offense when it is present in order to protect contraband." Section 924(c)(1) sets mandatory minimum sentences for "any person who, during and in relation to any . . . drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm." 18 U.S.C. § 924(c)(1). Johnson argues, and the government agrees, that the quoted portion of the instruction was wrong in two respects. First, the jury could have taken the court's statement to mean that so long as a gun was present to protect the drugs, the defendant was guilty of violating § 924(c)(1). That of course is not correct. The defendant must be linked to the gun; under the statute, it is the defendant who must use the gun or carry it or possess it. The existence of a gun in the defendant's presence is not enough. Second, for a defendant to "use" a gun within the meaning of § 924(c)(1), he must "actively employ" it in a way that goes beyond merely possessing it. *See Bailey v. United States*, 516 U.S. 137, 150 (1995); *United States v. Wheeler*, 525 F.3d 1254, 1256 (D.C. Cir. 2008). Yet the instruction said that the presence of the gun alone suffices to make out "use" in violation of the statute.

Our review is for plain error because Johnson did not object to this portion of the instruction. *See* FED. R. CRIM. P. 30(d) & 52(b). An error that does not affect a defendant's "substantial rights" will not lead to a reversal of his conviction. *See* FED. R. CRIM. P. 52(a) & (b); *Wheeler*, 525 F.3d at 1256; *United States v. Watson*, 409 F.3d 458, 465 (D.C. Cir. 2005). If the defendant objected to an erroneous instruction, it is the government's burden to show that the error was harmless. If the defendant did not object, it is the defendant's burden to show not only that the error was obvious, but also that it prejudiced him. *See United*

*States v. Olano*, 507 U.S. 725, 734 (1993); *United States v. Andrews*, 532 F.3d 900, 912 (D.C. Cir. 2008).

We shall assume that the error here was a plain error.  But we cannot see how the error could have had any effect.  It is understandable that Johnson did not object to the instruction. Whether he "used" the gun was a non-issue.  No one would suppose that tossing the gun out of the window amounted to using it to protect the drugs.  Yet that is the only evidence of Johnson's active "use" of the gun.  This is why all the focus was on whether Johnson possessed the gun to further drug crimes. The prosecutor's closing argument, which helps place the matter in context,  *see United States v. Chan Chun-Yin*, 958 F.2d 440, 444 (D.C. Cir. 1992), was limited to convincing the jury that Johnson possessed the gun and "had that gun to protect the drugs that were in that bedroom."  *See United States v. Wahl*, 290 F.3d 370, 375–77 (D.C. Cir. 2002).  The prosecutor never argued that Johnson had actively employed the gun and there was no evidence that he had.  Nor did the prosecutor at any point suggest to the jury that it had the option of convicting Johnson merely because a gun was present in the bedroom, or because someone else may have used or possessed it.  In light of the overwhelming evidence on the subject, the jury must have found that Johnson possessed the gun. *See Johnson v. United States*, 520 U.S. 461, 470 (1997); *Neder v. United States*, 527 U.S. 1, 9 (1999).  Both sides agree that the court correctly instructed the jury with respect to the § 924(c)(1) crime of possessing a firearm in furtherance of a drug offense.  The mistake in the gun instruction therefore did not entitle Johnson to a reversal of his conviction for violating § 924(c)(1).

Johnson's next argument is that the district court improperly excluded an item of evidence.  At trial, FBI Agent James Manzi testified that he was the seizing agent during the search.  As such, he had the duty of listing the seized drugs and other items

on an inventory form. Agent Manzi further testified that on the form he named Johnson's stepfather, Carlos Williams, as the person from whom the items were seized in this case. Manzi explained that by the time he filled out the form the agents had removed Johnson from the premises and that FBI practice in these circumstances was to have the owner of the premises sign the form. Agent Manzi said that Williams, the owner of the townhouse, refused to sign the form. Johnson asked the court to admit the inventory form pursuant to the business records exception to the hearsay rule. The court denied his motion. During deliberations, the jury sent two notes to the judge requesting the form. The court replied that the form had not been admitted into evidence.

We shall assume *arguendo* that the court erred in excluding the form. Even so the error was harmless. *See Kotteakos v. United States,* 328 U.S. 750, 776 (1946); *United States v. Coumaris*, 399 F.3d 343, 349 (D.C. Cir. 2005). Agent Manzi's testimony accurately conveyed to the jury what he had written on the form. Johnson's counsel used the form to mount an argument that the drugs seized from the bedroom really belonged to Carlos Williams, an argument the jury would have been in no better position to evaluate had it viewed the form rather than learned of its contents through testimony. *See Coumaris*, 399 F.3d at 350.

## III

This brings us to the question whether the government violated its duty under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), to disclose evidence favorable to the accused that is material to either guilt or punishment. Evidence is "material" only if "'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley*, 514 U.S. 419, 433–34

(1995) (*quoting United States v. Bagley*, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.)). A "probability" reaches the level of "reasonable" when it is high enough to "undermine confidence in the verdict." *Id.* at 435; *see United States v. Bowie*, 198 F.3d 905, 909 (D.C. Cir. 1999). The court does not have to be convinced that it is "more likely than not that the defendant would have been acquitted had the evidence been disclosed." *Bowie*, 198 F.3d at 909 (*citing Kyles*, 514 U.S. at 434).

Two additional aspects of the analysis deserve mention. The first is that the *Brady* factors must be assessed count by count. A *Brady* violation with respect to the defendant's conviction on one count does not necessarily affect his conviction on any other count. *See United States v. Oruche*, 484 F.3d 590, 597 (D.C. Cir. 2007); *United States v. Lloyd*, 71 F.3d 408 (D.C. Cir. 1995). For each count, then, the court must evaluate each of the three components of a *Brady* violation: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

The second point is that there is some question in the circuits about whether, in order to make out a *Brady* violation, the undisclosed information must constitute admissible evidence. *See Ellsworth v. Warden*, 333 F.3d 1, 5 (1st Cir. 2003) (en banc); *cf. United States v. Derr*, 990 F.2d 1330, 1335–36 (D.C. Cir. 1993). In *Ellsworth*, the First Circuit joined several other circuits in holding that if the suppressed evidence, although itself inadmissible, "would have led directly to material admissible evidence" the defendant has a viable *Brady* claim. 333 F.3d at 5. In Johnson's case, the district court indicated that the undisclosed information would have been admissible.

*United States v. Johnson*, No. 03-488, 2007 WL 666566, at \*8 n.4 (D.D.C. Feb. 28, 2007) ("Mem. Op."). The government does not argue against this view and we shall consider it conceded.[1]

The undisclosed information, obtained from a government informant, was that Johnson's cousin, Cinquan Blakney, owned the heroin seized from 1138 Wahler Place, that he – Blakney – said he was storing his heroin there, and that Blakney's mother told Johnson's mother that Johnson "has to take his beef." At Johnson's trial, the prosecutor offered the jury two evidentiary theories for finding him guilty of the drug charges. The first was that the drugs were his – that he owned them. The second was that he was storing the drugs for someone else with the intent to return them to that person.

The undisclosed evidence directly contradicted the government's first theory. As to the second theory, the district court concluded that although the "evidence is helpful to Johnson, it does not exculpate him." By this the court meant that Johnson was charged with possession, not ownership, and that he could have been convicted of possession even if Blakney owned the drugs. This is true, but not dispositive. Johnson's defense was that he did not own the drugs, that his relatives regularly used the bedroom, that someone else must have placed the drugs in storage there, and that he did not "exercise dominion and control" over the drugs found there, *Byfield*, 928 F. 2d at 1166, even if he was near the drugs. *See United States v. Clark*, 184 F.3d 858, 863 (D.C. Cir. 1999). The evidence regarding his cousin Blakney's ownership of the heroin

---

[1] Circumstances have changed since Johnson's first trial. *Cf. Ellsworth*, 333 F.3d at 5–6. Blakney's later plea of guilty, *see infra* p. 12, may have deprived him of a Fifth Amendment privilege not to testify about his ownership of the heroin.

bolstered Johnson's defense. The jury would not have had to speculate about whether the heroin belonged to some other unnamed person. "Disclosure of [Blakney's] statements would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense." *Kyles*, 514 U.S. at 441. The government's failure to disclose evidence establishing Blakney's ownership of the heroin therefore undermines our confidence in Johnson's conviction for possessing the heroin with intent to distribute it. Johnson was entitled to assert the stronger defense and we are not confident every juror would have rejected it. *See Cone v. Bell*, 129 S. Ct. 1769, 1773 (2009).

The government insists that Johnson must have known who owned the heroin. Thus, there was no *Brady* violation because the Due Process Clause does not require the government to disclose evidence already known to the defense. *See Derr*, 990 F.2d at 1335. The district court rejected this argument and so do we. As the court pointed out, there was "no proof that Johnson had been put on notice that Blakney had provided an admission to a government informant" or that Johnson otherwise knew of Blakney's culpability. Mem. Op. at *9.

The government also cites a court of appeals opinion stating that undisclosed evidence was not material under the *Brady* standard because it "[did] not directly contradict the state's evidence." *Apanovitch v. Houk*, 466 F.3d 460, 482 (6th Cir. 2006). We do not believe this accurately reflects the state of the law. In a later case, the Supreme Court indicated that although undisclosed evidence "did not directly contradict [the government witness's] trial testimony," it could be considered *Brady* material because "it does place it in a different light." *See Cone*, 129 S. Ct. at 1784 n.17.

Although the *Brady* violation with respect to the heroin charge entitles Johnson to a new trial on that count, it is not clear

what impact we should attribute to Blakney's admission with respect to the crack cocaine charge (and hence the gun charge). Developments after oral argument may eliminate our need to make that assessment. At the court's request, the government supplied a copy of the grand jury's indictment of Blakney and a plea agreement the government later reached with him. The indictment, returned August 23, 2006, charged Blakney with multiple drug and gun offenses. Five of the counts charged heroin, crack cocaine and gun offenses occurring "[o]n or about August 21, 2003," the date of the search of the townhouse at 1138 Wahler Place. Blakney pled guilty to a conspiracy count, which named eight co-conspirators, not including Johnson, and others known and unknown to the grand jury. In connection with the plea agreement, the government submitted a proffer in which Blakney admitted that he "utilized a home at 1138 Wahler Place, S.E. . . . to store heroin and crack cocaine," and that in a search of those premises on August 21, 2003, the FBI "recovered illegal contraband belonging to Cinquan Blakney, including approximately a ½ kilogram of heroin, and about 150 grams of crack cocaine." These were the drugs Johnson was convicted of possessing with intent to distribute.[2] (It may be that Blakney also owned the gun recovered from outside 1138 Wahler Place; this is not entirely clear.) In a supplemental brief filed in this court, the government reported that before Blakney's indictment another informant had revealed to the government that Blakney owned the crack cocaine seized at 1138 Wahler Place. Whether this information came to the government before Johnson's trial cannot be determined from the material before us.

The government, while discounting the significance of Blakney's indictment and plea, and the information provided by

---

[2] Actually, the agents recovered 73 grams of crack cocaine from 1138 Wahler Place on that date, not 150 grams.

the second informant, suggests that we remand the case to the district court to determine the impact of the newly disclosed evidence. We agree with this disposition. Of course, if the government had the information regarding Blakney's ownership of the crack cocaine at the time of Johnson's trial, our analysis regarding the heroin would apply and would lead to reversal of Johnson's crack cocaine conviction and the derivative gun charge. If the district court finds that the government did not possess the newly disclosed information at that time, the court should proceed to determine whether a new trial on the crack and firearm charges is nevertheless warranted. *See Cone*, 129 S. Ct. at 1786 & n.19.

\* \* \*

For these reasons, Johnson's conviction on the heroin charge is reversed and remanded for a new trial. With respect to his convictions on the crack cocaine and gun charge, the case is remanded for further proceedings consistent with this opinion.

*So Ordered.*